CHICAGO DOLLAR DIRECTORY CO. et al. v. CHICAGO DIRECTORY CO.

(Circuit Court of Appeals, Seventh Circuit. March 20, 1895.)

No. 210.

COPYRIGHT—DIRECTORY—INFRINGEMENT—EVIDENCE—INJUNCTION.

Defendants compiled and printed, and were about to publish, a business directory of the city of Chicago, containing about 60,000 names, alphabetically arranged, under an alphabetical classification of businesses, containing about 800 pages. On a preliminary hearing, in a suit for infringement of complainant's copyrights in annual directories of the city of Chicago, it appeared that 67 errors in the annual business directory of complainant were followed in defendants' directory. Defendants' canvassers testified that they made a personal canvass, and obtained the names from original sources. *Held*, that an order granting an injunction against the whole book should not be disturbed.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

This was a bill in equity brought by the Chicago Directory Company, a corporation of the state of Illinois, against the Chicago Dollar Directory Company, the Interstate Directory Company, Emory A. Hartsig, J. E. Scanlan, W. E. Bishop, James Ditty, and others, for infringement of copyright. The bill alleged that for the last 20 years complainant and its predecessors had compiled and published an annual general directory of the city of Chicago, and for more than 10 years past an annual business directory of the city of Chicago. The bill alleged that the general directory and the business directory for the year 1893, which were known as "The Lakeside Annual Directory" and "The Lakeside Annual Business Directory," respectively, were duly copyrighted. It also alleged that the business directory embraced an alphabetical list of business houses and persons in the city of Chicago, occupying 562 pages, and also a classified list of the various businesses and callings, alphabetically arranged, with the names of the persons thereunder, occupying 655 pages, and also miscellaneous information, covering about 218 pages. The bill further alleged that Emory Hartsig, J. E. Scanlan, and W. E. Bishop were the managing officers of the Interstate Directory Company, and that said persons, with Ditty and other defendants named, were managers, agents, or employés of the Dollar Directory Company, which latter corporation was doing business under various names; that defendants, in furtherance of a scheme to injure and defraud complainant and pirate and infringe the copyrights of its said directories, had compiled a business directory of the city of Chicago planned similar to that of complainant, 600 pages of which had already been printed; that pages 101-646 were made up substantially by copying from complainant's business directory, and that in such copying defendants had copied numerous errors and mistakes which were contained in complainant's business directory, 14 of which errors were set out; that defendants had not compiled their directory from

original sources of information, but had made it up substantially by copying from complainant's business directory and general city directory for the year 1893, with a few colorable changes, made apparently for the sole purpose of evading the law. The bill prayed an injunction, and an account of profits, and general relief. The bill was sworn to and filed May 26, 1894, and on the same day served upon defendants, with notice of motion for an injunction.

On June 1, 1894, defendants filed a demurrer to the bill, on the ground that the copyrights were not duly alleged, and that it was nowhere shown that there was a similarity between the directories in question. On June 5, 1894, defendants filed an answer, in which they specifically denied all the material allegations in the bill. They alleged that there were numerous errors and mistakes in complainant's directory, which to a very large extent had been corrected in the directory proposed to be published by defendants. They denied that they had not made up their business directory from original sources of information, and they denied that they had made up the same "substantially, or otherwise, by simply idiotically, or otherwise, copying" complainant's business directory or general directory of 1893. Further answering, defendants alleged that Hartsig, about the month of March, 1892, undertook to prepare a business directory of the city of Chicago, and in pursuit of such enterprise employed agents, from three to ten, at different times, from such date up to and until October 1, 1893, to canvass said city for the purpose of getting the names and addresses of the business people of the city; that about the latter date said Hartsig, having obtained through said agents and otherwise a very considerable number of names and addresses, but not a complete list, sold and transferred the same to defendants Bishop and Ditty, together with the enterprise and good will, and that thereupon said Bishop and Ditty undertook and further prosecuted the incomplete work of canvassing all names and addresses of business people in said city in districts and places not covered by Hartsig, and subsequently organized the Chicago Dollar Directory Company, and incorporated the same, and under such incorporation have further prosecuted the work for the purpose of completing the list, employing for that purpose since October 1, 1893, and up to about April 1, 1894, seven or more agents to make a personal canvass, upon whose reports, and those of the agents previously employed by Hartsig, defendants' proposed directory has been compiled; that, in pursuit of their business enterprise, defendants had expended the sum of $12,000.

Complainant supported its motion for a preliminary injunction by various affidavits, among which was that of Reüben H. Donnelley, manager of complainant company, who swore that James Ditty, who was formerly, and for many years, in the employ of complainant, admitted to deponent, in a conversation on or about January 15, 1894, that defendants' solicitors had been using slips for canvassing for information and advertisements for defendants' directory by cutting and pasting the capital letter lines from the Lakeside City Directory for 1892, but that this had not been done since he assumed the management of the affairs of the Dollar Directory Company. In another affidavit of said Donnelley it was averred that the information for the compilation of complainant's annual directories is obtained from original sources by actual canvass, in the making of which complainant employ from 250 to 300 persons for a space of five or six weeks, and that the compilation of the material so collected occupies several weeks after the completion of the canvass, and employs the labor of about 50 persons. In an affidavit made by John G. Rickard he averred that he had been employed for three years as compiler and canvasser by complainant, except for a period of five weeks, commencing January 8, 1894, when he was employed in compiling on the Dollar Directory, in which work he was furnished by Ditty, the manager, with slips containing the names and addresses and businesses of persons to be compiled for the Dollar Directory; that deponent observed in the handling of said slips, and in compilation thereof, that large numbers of said slips, containing the names of persons commencing with the same letter of the alphabet, were in the handwriting of the same person, while the locations of the persons as given upon the slips were widely separated and remote from each other, and that the same had evidently been copied by one person from a list or directory already compiled, and had not been obtained by a personal canvass; and the deponent believed that the slips used by him in compiling were copied from the alphabetical

list of names in complainant's business directory for 1893, and that deponent and other persons employed by the Dollar Directory Company, in compiling its business directory, under the direction of the said Ditty, used complainant's business directory for 1893 in making corrections of the information contained in said slips, and in deciphering illegible writing, and in determining correct locations, where the slips were imperfect in that respect, and that the compilers made constant use of complainant's business directory, and that the correction of slips was made without any other inquiry or investigation.

Defendants, for answering proofs, filed an affidavit by Emory A. Hartsig, in which deponent alleged that from March, 1892, until October 1, 1893, he employed from three to ten agents to make an original inquiry for the purpose of a business directory, and that on the latter date he transferred to defendants Bishop and Ditty the slips and information obtained by himself and canvassers, and the good will of his enterprise, and that he secured none of said information and reports by copying from complainant's business directory for 1892. Defendant also filed affidavits by Samuel Hartsig, William O. Henry, and Joseph Leckey, who swore that they were employed by Ditty from about October 1, 1893, until April, 1894, in canvassing for names, etc., for defendants' business directory, setting out the territory covered by them. Edward S. Rowley, proof reader with the printers of defendants' directory, swore that he read the entire proof on the directory; that the copy was prepared by pasting individual directory slips upon long sheets of paper in the order in which they were to appear, and that the same was prepared in the handwriting of different persons, as though reported by various agents, and apparently in the manner usually adopted in compiling a directory from original sources through a personal canvass, and that the material did not have the appearance of having been copied from some other directory. An affidavit was also made by James Ditty, who had the management of the preparation of the Dollar Directory, who swore that he had been engaged in the enterprise since September 7, 1893, and in pursuit thereof had constantly employed agents, varying in number from 7 to 18, to make original canvasses, and had compiled the directory entirely from slips made by such agents and those furnished by Emory A. Hartsig, and not by imitating complainant's business directory for 1893; that in compiling defendants' directory he used a copy of the Lakeside Annual Directory for 1893, for the purpose of checking up the information returned to him by his agents, and that in correcting mistakes of his agents by such comparison he inadvertently inserted the names and addresses alleged in the bill of complaint as showing errors followed. Deponent further averred that the copy from which the directory was printed was destroyed and disposed of prior to May 25, 1894, preparatory to removal from defendants' office, in the Adams Express Building, to the Rialto Building, and that deponent is therefore unable to produce the same as evidence in the case.

The motion for a temporary injunction was overruled without prejudice to complainant's right to renew the same, and the cause was referred to E. B. Sherman, Esq., a master in chancery, to take proofs which might be used for a further motion.

On the hearing before the master, complainant put in evidence "Take 417," which it appears was surreptitiously obtained from the possession of defendants' printers for complainant's inspection. This was admitted to be a part of the copy for defendants' directory. There were 22 names on the "take," which were on directory slips pasted on a long strip of paper, all of which appeared in defendant's directory under the head of "Cigar Manufacturers." All of the names but two were in the same handwriting, and one of such two was written by one Mathison, while soliciting advertisements and subscriptions. Rowley, the proof reader, and Burt, the person who held the copy, testified that "Take 417" resembled copy which passed through their hands. The copy holder testified that, while the copy was in various handwritings, four or five or more of the slips in one handwriting would come together. Mathison, a witness called for complainant, testified that he did soliciting for Dollar Directory advertisements, and in such work would hand in the names on regular directory slips; and that about January 1, 1894, he had written between 4,000 and 5,000 names on slips for Hartsig, which he had copied from printed sheets about the size of a directory page, giving the name

of the person, his address and business. He was unable to identify such sheets, though conversant with complainant's directories. Richard testified for complainant that he was engaged five weeks after January 8, 1894, in compiling, with three other men, on defendants' directory; that the slips so compiled were in at least 10 different handwritings, and that he noticed that a number of names beginning with the same letter would run along together in the same handwriting; and that he, with the other compilers, used the Lakeside Business Directory for 1893 in making corrections on the slips and for reference in various ways for information, and that there was no dispatching done save in the building which defendants then occupied; that the work of the compilers was turned over to Ditty, and that he did not see it thereafter, and that the slips so compiled by him appeared to have been copied from the alphabetical portion of the Lakeside Business Directory; that he copied a number of names in "caps" from the Lakeside Business Directory, but that he did not know that any were reprinted in defendants' directory.

Complainant produced witnesses whose testimony tended to show that the copy from which the Dollar Directory had been printed was fraudulently destroyed or concealed to prevent its use as evidence. One witness testified that Ditty had admitted to him, several days before the copy was alleged to have been destroyed, that he understood that complainant was going to get out an injunction restraining defendants from publishing their directory. Ditty swore that the copy had been taken from the vault in his office, and had been torn up, and thrown in the corner of the room, and presumably removed by the janitor in the course of his duty in taking out waste paper, and this was between May 23d and May 25th. The testimony on this subject was quite conflicting. The janitor of the building could not say whether he removed waste paper similar to "Take 417." One of the men who helped defendants to move from the Adams Express Building testified that he carried out a large pile of matter like "Take 417," in several bundles, tied loosely with a string around the center; while another, who loaded the wagon, testified to a very small amount of matter of about that size, but wrapped so that he could not tell what it was. Donnelley testified that a search in the paper warehouse to which all scrap paper from the building was carried revealed a large amount of matter from defendants' office, but nothing similar to "Take 417." Donnelley, in calling at defendants' vacant office, was handed a portion of "Take 1199," which the janitor had picked up. Ditty testified that matter somewhat similar to "Take 417," which had been removed from his office in the Adams Express Building, was copy for a directory of another city for the Interstate Directory Company.

It appeared that there were about 60,000 names in defendants' directory. Ditty testified that he got from 40,000 to 50,000 names from Hartsig, and that he added probably 7,000 or 8,000 names after he took the matter in hand; that he kept no record of the territory covered by his various canvassers. There was no record kept by Hartsig of the particular territory covered by his canvassers. Ditty explained the use made of the Lakeside Annual Directory of 1893, for the purpose of checking, as follows: "There were several names copied from the Lakeside Directory, and I had those things arranged in proper alphabetical order under the headings, and then, as it came to me, of course, I compared them with the slips that I had gotten on an original canvass, and also those that Mr. Hartsig had turned over, and I checked those things up, and when I found any name that was missing I would dispatch for it." Ditty claimed that the errors followed, if any there were, must have been caused by the failure of his dispatchers to properly verify the names so dispatched for. He also testified that the slips turned over to him by Hartsig were in bunches, as though they had just come from the hands of the persons who had obtained the names from a personal canvass; that, owing to the poor condition of the slips secured from original sources, it was frequently necessary to have them copied; that the person whom he employed for pasting the slips for copy did the work very indifferently, and that the papers, when laid together, would stick and become torn, and that many of the slips would have to be copied; and that the "cap" slips, which were cut from complainant's directory, were used for the purpose of soliciting advertisements and subscriptions, and not otherwise. He also testified from memory as to most of the territory claimed

to have been covered by his canvassers. Emory A. Hartsig testified that, in undertaking the original enterprise, he had the city blocked out into large sections, cutting up a Rand-McNally map for that purpose, and that at the time of selling the business to Bishop and Ditty he believed he had canvassed the entire city; and that he was assisted by Scanlan, who was at the present time very ill at his home in Connecticut. Hartsig also testified as to the work done by the canvassers employed by him, and as to about the time and the territory covered by each. Neither Hartsig nor Ditty produced any record or entries showing the territory covered by their various canvassers, or the time for which they worked, or the amounts paid them; and Hartsig testified that no such records were kept or entries made. Hartsig gave the names of nine canvassers who worked for him, and approximately the territory covered by them. He was unable to give the addresses of four of such canvassers. The other canvassers, save Scanlan, who was very ill at his home in Connecticut, testified that they made a personal canvass, specifying approximately the territory covered and the time which they worked, from which it appeared that they spent an average of two and a half months each on such canvass, from November, 1892, to August, 1893. Defendants also produced five of the canvassers who worked under Ditty, who testified that they made a personal canvass, specifying the territory covered. All of the compilers, as well as the persons who pasted the slips for copy and the foreman for the printers, testified that there were from 10 to 20 handwritings on the slips; and three of the compilers, who had been canvassers, testified that during their work of compiling they recognized in the materials slips which they had gathered themselves from original sources. Eight different witnesses testified that they did dispatching for Ditty, some of whom were engaged a month or more on such work. All of defendants' compilers, save Rickard, testified that the errors discovered in compiling were not corrected by the compilers, but that the slips were turned over to Ditty, who dispatched for the names. The agents of several large office buildings, alleged to have been canvassed by defendants, were called on behalf of complainant, and testified as to several occupants who had moved in after complainant's directory of 1893, and before the last canvass made for defendants' directory, whose names were not in the latter directory. There were also names in defendants' directory of persons located at places which the canvassers testified they did not cover, and of persons who deceased before defendants' last canvass was made.

Complainant produced evidence of 67 errors followed, most of which could only have been made by copying from complainant's book. Defendant produced an exhibit showing about 3,600 differences between the two books, consisting in the names and addresses, and in additional names found in defendants' directory that were not found in complainant's directory. It also appeared that, while complainant's directory gave the names of about 650 music teachers, defendants' directory gave only 300. It appeared that the names in the defendants' directory under the head of "Saloons" were obtained directly from the licensed bonds on file in the city hall.

After a hearing, the court, June 23, 1894, decreed that defendants should be enjoined "from in any manner, either directly or indirectly, any further printing of the matter, or any part thereof, contained in the Chicago Dollar Business Directory for 1894, except the names under the head of 'Saloons,' commencing on page 690 and ending on page 738, and from publishing or selling, or exposing to sale or delivery, to patrons or subscribers, or any other person, any of the printed sheets, bound or unbound, or in process of binding, except as aforesaid, constituting said Chicago Dollar Business Directory, or in any other book, directory, or gazetteer."

A motion was made to dissolve the temporary injunction issued in accordance with such decree, in support of which defendants filed an affidavit of Joseph E. Scanlan to the effect that deponent was unable to attend at the taking of the testimony before the master because of sickness, and corroborating the testimony of Hartsig as to the manner in which the original canvass was taken; and in which deponent further averred that the sheets given to Mathison for copying contained names of firms or persons engaged in business in the city of St. Louis, and were not a part of the Chicago directory, but were used for the Interstate Directory Company, for the purpose of checking up information for the St. Louis section of the Interstate Di-

rectory. An affidavit was also filed by Hartsig to the same effect. Affidavits of three of defendants' canvassers were also filed, which were to the effect that deponents remembered having made a personal canvass of 16 of the names set out as showing errors followed, and that in some instances the names as they appeared in defendants' directory were the names that were given to deponents at the time the canvass was made. Defendants also filed an affidavit by one Parks, to the effect that he had had long experience in directory work, and had assisted for four months in the compilation of the Dollar Directory, and that the slips were in the handwriting of 15 or more persons, and that after the same were compiled in alphabetical order the different handwritings were interspersed through the alphabet, and that they did not show from their appearance or arrangement that they had been copied from some other directory, but that after they had been compiled they presented the appearance and arrangement that directory slips would naturally present which had been gathered from original sources of information by a personal canvass among the business houses of the city; that after May 4, 1894, deponent did not see either Bishop or Ditty, or notify them as to his location, until August 13th, and that from June 2d until August 6th deponent was out of the state. Defendants also filed an affidavit by De Lisle, one of their compilers, to the effect that he had had a conversation with Rickard since the hearing before the master, in which Rickard admitted that he testified falsely. In answer to such proof complainant filed the affidavit of Rickard, in which he denied the conversation sworn to by De Lisle.

After hearing, the court, September 19, 1894, denied the motion, and defendants took this appeal, assigning as error the action of the court: (1) In deciding that the complainant had submitted sufficient evidence of the validity of the copyright of the book sued on, in view of the fact that no certificate of the librarian of congress or other satisfactory evidence was offered by complainant to show that complainant had duly complied with the copyright law in the premises. (2) In continuing the preliminary injunction notwithstanding the fact that it appeared from the evidence that defendants had, through agents, made a general canvass of the city of Chicago, and secured from the original sources of information the matter from which the alleged infringing book was published. (3) In deciding that the fact that certain errors which were in the book sued on also appeared in defendants' book was proof that the latter had been copied from the former, and that, therefore, defendants' book was an infringement of complainant's copyright. (4) In deciding that the testimony of Herman Mathison that he had copied certain names from printed sheets upon directory slips for Emory A. Hartsig, one of the defendants, was evidence that they were names copied from complainant's book sued on, and were used by defendants in printing their alleged infringing book. (5) In continuing the preliminary injunction, notwithstanding the fact that it appeared from the evidence that the copy or manuscript from which the alleged infringing book of defendants was printed was compiled from regular directory slips gathered by defendants and their agents from the original sources of information. (6) In continuing the preliminary injunction, in view of the fact that it appeared from the evidence that the damage to defendants, if the same were continued, would be irreparable, and would involve the almost total loss of $12,000 to them, while the evidence did not show that complainant would have been damaged at all if the preliminary injunction had not been continued. (7) In continuing the preliminary injunction, because the bill of complaint nowhere states or shows that the complainant would suffer or sustain any damage in consequence of the alleged infringement, nor do the evidence, exhibits, and affidavits prove, or tend to prove, that the complainant would suffer any damage by reason of or in consequence of the alleged infringement of his copyright. (8) In continuing the preliminary injunction, because the bill of complaint in this case does not make out or state a sufficient cause of action upon which an injunction pendente lite might issue. (9) In deciding that Exhibit A of complainant was an infringement of complainant's alleged copyright of its Exhibit B. (10) In deciding that the fact that defendants used the book sued on, in checking up information for insertion in the alleged infringing book, constituted an infringement of complainant's alleged copyright. (11) In deciding that the evidence showed that any part of the al-

leged infringing book was prepared from matter copied from the book sued on. (12) In continuing the preliminary injunction upon the finding that the book sued on had been used by defendants to some extent in preparing and printing the alleged infringing book, and that some of the latter had been copied from the former. (13) In not excepting from said preliminary injunction all of the matter in the alleged infringing book of defendants that the court found was not copied from the book of complainant sued on, and was not infringing matter. (14) In not deciding that witness Rickard for complainant stood impeached. (15) In deciding that the evidence submitted by complainant regarding alleged errors that appear coincident in Exhibits A and B was competent. (16) In continuing said injunction, because the continuing of the same was contrary to the law and evidence in the case.

A motion was made to dismiss the appeal, the decision of which, with the proceedings relating to the same, will be found reported in 65 Fed. 463.

E. Banning, Thomas A. Banning, and Homer C. Fancher, for appellants.

Defendants dispute that the 67 names instanced by complainant as errors in its directory copied by defendants were either errors in complainant's directory or were copied by defendants. But, admitting complainant's contention, it appears that complainant has shown copying of only one name in a thousand. The names instanced are comprised on 52 pages, and to enjoin an entire book, of over 800 pages, because 67 names, appearing on 52 pages, have been copied, is unsupportable under the decisions. Publishing Co. v. Keller, 30 Fed. 774; Webb v. Powers, 2 Woodb. & M. 497, 524, Fed. Cas. No. 17,323; Lawrence v. Dana, 4 Cliff. 1–88, Fed. Cas. No. 8,136. There is no evidence to show that the printed sheets from which Mathison copied 4,000 or 5,000 names were taken from complainant's directory, and the evidence is uncontradicted that the names were intended for the Interstate Directory. It plainly appears that the copy from which the Dollar Directory was printed was destroyed several days before the suit was commenced, in the regular course of business, preparatory to defendants' moving their office. There is no evidence that such destruction was expedited, but the evidence is quite to the contrary. The work of Hartsig and Ditty and their canvassers covered a period of nearly two years, and all the canvassers whose names and addresses were known were called, and testified as definitely as possible as to the time and territory covered by them, and their testimony stands uncontradicted. All the persons who worked upon the compilation of the directory, save Rickard, testify that the slips had every appearance of having been obtained by a personal canvass, and that in the work of compilation no corrections were made in reliance wholly upon complainant's directory, but, in cases of discrepancies and omissions, the slips were passed to Ditty, who dispatched for the names. Complainant had for months known of defendants' competing directory, and its employé Rickard apparently entered defendants' employ at the instance of complainant, for the purpose of implicating them in a charge of infringement. Eight witnesses testified as to the dispatching which was done. The evidence overwhelmingly and conclusively establishes the fact that defendants made an original canvass, and proceeded in the proper way in the compilation of their directory, and did not copy from complainant's directory, and that the injunction granted by the court is wholly erroneous and unjustifiable. New York Grape-Sugar Co. v. American Grape-Sugar Co., 10 Fed. 837; Machine Co. v. Hedden, 29 Fed. 149; Scribner v. Stoddart, 9 Rep. 139, Fed. Cas. No. 12,561; Bonaparte v. Railroad Co., 1 Baldw. 218, Fed. Cas. No. 1,617.

John C. McClellan and L. L. Bond, for appellee.

The common errors prove not only copying in those particular instances, but they raise the presumption that the whole of defendants' book has been copied from complainant's book, and the burden of proof is on defendants to show, if they can, what part of their book, if any, was not copied from complainant's book. Droie, Copyr. 428, 515; Longman v. Winchester, 16 Ves. 269. The doctrine contended for by defendants is applied only to cases where the part copied can be readily separated from that which is original. Webb

v. Powers, 2 Woodb. & M. 497, Fed. Cas. No. 17,323. Takes 417 and 1,199 conclusively show the manner in which defendants' directory was made. Twenty names out of the 22 on "Take 417" are in the same handwriting, and the persons live in widely separate districts, alleged to have been canvassed by five or six different canvassers, and the 20 slips do not vary in the names, business designations, and locations from the way in which they are found in complainant's book. The fact that the manuscript from which defendants' book was printed appeared to be in the handwriting of from 10 to 15 different persons does not tend to prove an original canvass. The fact would be the same, though all the names were copied from complainant's directory. Defendants' testimony as to the destruction of the manuscript is wholly unworthy of credit, showing, as it does, a total disregard of business principles. Neither did the defendants make any effort to recover any of the manuscript, though it appears that it might easily have been recovered after the commencement of the suit. The absence of all evidence in writing as to defendants' acts, etc., relating to the original canvass, is a suspicious circumstance. It also appeared from the canvassers' testimony that they canvassed and recanvassed each others' territory, and they contradict each other as to the territory actually canvassed by them. If the evidence of Ditty's canvassers alone is to be believed, Ditty must have obtained 240,000 new names. The fact that defendants did a large amount of dispatching will not help them, if they, in fact, in the first instance, copied their names from complainant's directory. When a material piracy is shown, plaintiff will not be required to prove actual damages to maintain its right to an injunction. Drone, Copyr. 521; Campbell v. Scott, 11 Sim. 39; Tinsley v. Lacy, 32 Law J. Ch. (N. S.) 539.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

PER CURIAM. This appeal is from an interlocutory order of injunction, for a statement of which reference is made to the opinion of the court upon the motion to dismiss. The present question is of the merits of the order. The court has carefully considered the evidence, and, without entering upon a review, which might prejudice the final hearing, deems it enough to declare its conclusion that the appeal should be overruled, and it is so ordered.